63 A.3d 1107

**Alicia Daley PAUL**

v.

**BLACKBURN LIMITED PARTNERSHIP d/b/a**
**Country Place Apartments, et al.**

**No. 2727, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

March 25, 2013.

Timothy F. Maloney, (Veronica B. Nannis, Levi S. Zaslow, Joseph, Greenwald & Laake, PA, Greenbelt, MD, Peter C. Grenier, Andre M. Gregorian, Bode & Grenier, LLP, Washington, D.C.), on the brief, for Appellant.

Margaret F. Ward, (Ward & Herzog, LLC, on the brief), Baltimore, MD, for Appellee.

Panel: KEHOE, WATTS, JAMES R. EYLER, (Retired, Specially Assigned) JJ.

WATTS, J.

This appeal concerns the Circuit Court for Montgomery County's grant of summary judgment in favor of appellees, Blackburn Limited Partnership d/b/a Country Place Apartments ("Blackburn"), Berkshire Property Advisors, LLC ("Berkshire"), and Community Pool Service, Inc. ("CPS"), against appellant, Alicia Daley Paul, individually and as parent and guardian of Christopher Clinton Paul ("Christopher"), in a cause of action for negligence and recovery of medical ex-

penses related to the near drowning of then three-year-old Christopher in a swimming pool at Country Place Apartments. Appellant noted an appeal raising four issues, which we consolidate and rephrase as follows: [1]

Did the circuit court err in granting summary judgment in favor of appellees, and ruling that:

A.  Christopher was a trespasser to whom appellees owed only a duty of care to avoid willful and wanton misconduct or entrapment?

B.  Appellees did not engage in willful or wanton misconduct?

C.  Statutory and regulatory provisions governing public pools in Montgomery County did not apply to the pool at Country Place Apartments and, as such, appellees did not owe Christopher any statutory or regulatory duty?

For the reasons set forth below, we answer question I.C in the affirmative.  At oral argument, during rebuttal, appellant's counsel stipulated that, if this Court determined the existence of a regulatory duty, appellant would not proceed under common law theories of liability at trial.  In light of our decision as to question I.C, we do not address questions I.A or I.B, concerning Christopher's common law status and any common law duty owed to him by appellees.  We shall, therefore, reverse and remand the case for further proceedings consistent with this opinion.

---

1.  Appellant phrased the issues thus:
    I.  Did the [circuit] court err in granting summary judgment when [a]ppellees' pool was in violation of COMAR, Montgomery County Code and COMCOR?
    II.  Did the [circuit] court err in concluding that [appellees] owed 3–year old lawful tenant, Christopher Paul, no actionable duty of care?
    III.  Was it error for the [circuit] court to determine that a lawful tenant was a trespasser in the common area pool of his apartment complex when the nonfeasance of [appellees] allowed him to enter the unsupervised pool and nearly drown?
    IV.  Did the [circuit] court usurp the province of the trier of fact in deciding questions of fact related to tenant Christopher's status and [appellees'] willful and wanton conduct?

## FACTUAL AND PROCEDURAL BACKGROUND

### (a) The Pool

Blackburn owns an apartment complex in Burtonsville, Maryland called Country Place Apartments ("Country Place"), which has an outdoor swimming pool ("the pool") and a playground as community amenities. Country Place is a large apartment community, containing over 300 units. Berkshire generally manages Country Place, and CPS manages the pool at Country Place.

The pool and pool deck are surrounded by a metal fence approximately six feet high. The pool and fence were constructed in 1978, and, at the time of the incident, the fence had not undergone any replacements or renovations since its original construction. Two vertical gates controlled access to the pool area. When the pool was open, pool staff would remove the padlock and chain that locked the gates together, and the gates would swing in toward the pool, closest to the deep end of the pool. When the pool was closed, pool staff would affix the padlock and chain to the upper half of the gate. There was no lock on the bottom portion of the gate. Berkshire, the property management company, was responsible for maintaining and repairing the fence.

On March 23, 2010, CPS entered into a written "Swimming Pool Management Agreement" (hereinafter "the pool agreement") with Blackburn, for operation and maintenance of the pool from May 29, 2010, to September 6, 2010, for $19,900.[2] In the pool agreement, the general pool hours are listed as 12:00 p.m. to 7:00 p.m. on Tuesday, Wednesday, Friday, Saturday, Sunday, and any holiday. Under the pool agreement, CPS agreed to meet with a representative of Blackburn "[a]t least once per week ... to discuss the pool operation and any related problems." At that weekly meeting, CPS was to "make any recommendations to [Blackburn] which it deem[ed]

---

**2.** A prior pool agreement, dated September 7, 2009, and signed by Blackburn on October 29, 2009, contains the same provisions and responsibilities relating to the 2010 swimming season.

appropriate for a safer, more efficient or more beneficial operation of the pool."

Pursuant to the terms of the pool agreement, CPS was responsible for the daily maintenance and operation of the pool, limited to maintaining proper filter operation, water quality, and health department records, and cleaning the pool and pool area. CPS also agreed to conduct "a minimum of three (3) Pool Inspections per week by its supervisory personnel[,]" that "w[ould] cover all phases of pool operation."

Pursuant to the pool agreement, Blackburn was responsible for completing the following tasks by April 15, 2010:

1. Complete all building repairs such as broken windows or doors, toilet partitions, damaged tile or dry wall etc. Provide soap, towel and tissue dispensers at all fixtures as needed.

2. Complete any needed plumbing repairs[.] . . .

\*      \*      \*

5. Provide working locks on all doors, gates and windows and provide [CPS] with keys.

6. [E]nsure all fencing meets local codes and prevents unauthorized entry into the pool area. Repair as necessary.

In the pool agreement, CPS and Blackburn agreed that CPS would not be "responsible for any losses or damages caused when the pool is not open, by those acts or omissions of third parties over whom [CPS] has no control, or by failure of [Blackburn] to comply in a timely manner with its responsibilities under" the pool agreement. Blackburn agreed to indemnify CPS against claims "arising from or out of maintenance, operation, repairs or use by [Blackburn] and/or its agents, servants, employees, invitees, licensees, contractors and/or trespassers or any breach of the [pool a]greement."

Country Place's "Pool Rules and Regulations 2010," provided, in pertinent part, as follows:

1. No one will be able to enter the pool area without his or her pool pass.

2. All persons using the pool or pool area do so at their own risk. The management and agents assume no responsibility for any accident or injury in connection with such use. Persons using the pool covenant and agree with the owner, management, or its agent for or on account of any loss of life or personal injury, damage to or loss of personal property. Residents and their guests agree to use extreme care and caution in all acts concerning their activities in order to avoid mishaps to themselves and others.

*     *     *

5. Residents and their guests using the pool facilities do so with the understanding that they comply with all the rules and regulations proclaimed by local jurisdiction.

*     *     *

8. *Children in the pool area under the age of 16 years old must be accompanied by an adult member of their family at all times.*

(Emphasis in original). The Pool Rules and Regulations stated that the pool did not open until noon on the days it was open.

### (b) The Lease and the Near Drowning

In June 2010, Christopher, born March 1, 2007, resided at Apartment 22, a second floor apartment at Country Place, with his parents, appellant and Junior Christopher Paul ("Junior"), and his ten-year-old half-brother, Andre. In the "Apartment Lease Contract," dated and signed by appellant on May 19, 2009, appellant agreed to use the pool "with care in accordance with apartment rules and posted signs" and to "comply with any written apartment rules and community policies[.]" Blackburn, in turn, agreed to "keep common areas reasonably clean," "substantially comply with applicable federal, state, and local laws regarding safety, sanitation, and fair housing[,]" and "make all reasonable repairs, subject to [the tenant's] obligation to pay for damages for which [the tenant is] liable." In a "Montgomery County, Maryland–Addendum," Blackburn agreed to "deliver the leased premises and all

common areas in a clean, safe, habitable and sanitary condition, free of rodents and vermin, and in complete compliance with all applicable laws." In the addendum, Blackburn acknowledged its "responsibility for maintaining the premises in accordance with all applicable laws."

On June 11, 2010, appellant, Junior, Andre, and Christopher received pool passes for Summer 2010. On June 12, 2010, Junior took Andre and Christopher to the pool during operating hours. On the morning of the following day, Sunday, June 13, 2010, when he woke up, Christopher asked appellant if he could go to the pool, and she told him the pool was not open. Christopher continued to ask appellant if he could go to the pool, and appellant told him that the pool was closed, that they could not go to the pool, and that they would go to the pool in the afternoon.

Later that morning, at approximately 10:00 a.m., Andre and Christopher left the apartment to play at the playground.[3] While playing, Andre left Christopher to fetch a toy that Christopher had thrown down a hill next to the playground. When Andre returned to the top of the hill near the playground, he could not find Christopher. Andre went to Apartment 22 to notify appellant that he could not find Christopher, and asked whether Christopher had returned to the apartment. Because Christopher had not returned, appellant and Andre left the apartment to search for him outside, believing that he was hiding from them. Appellant sent Andre to look behind the building, while she began looking in the parking lot at the front of the building.

After not finding Christopher in front of or behind the building, appellant and Andre eventually searched near the pool, which was closed, and appellant observed Christopher's

---

**3.** At a deposition taken on September 13, 2011, appellant testified that Andre and Christopher went outside by themselves on three separate occasions on the morning of June 13, 2010, for five to ten minutes on each occasion. Appellant testified that she did not check up on the boys while they were outside "because they ke[pt] on coming up back upstairs consistently" and "they weren't out for long periods where [she] need[ed] to wonder [about them]."

shirt and shoes on the ground inside the closed pool area. As appellant realized Christopher was in the pool area, Tiffany Miles, the pool manager, and Vitalie Plamiodeala, a lifeguard, arrived in a vehicle to open the pool for the day. Appellant yelled for Miles and Plamiodeala to open the gate because she believed her son was inside the pool area. At that point, Plamiodeala unlocked the padlock with a key and removed the chain on the gate. Appellant ran into the pool area and discovered Christopher unresponsive and submerged in the water in the five foot section of the pool closest to the gate.[4] Plamiodeala jumped into the pool and pulled Christopher out. Christopher was not breathing and did not have a pulse. Miles called 911 and she and Plamiodeala began rescue efforts on Christopher.

Paramedics arrived on the scene and continued rescue efforts as Christopher was still unresponsive. Paramedics administered epinephrine to restart Christopher's heart and transported him emergently to Howard County General Hospital, where he was partially stabilized, before being transported by helicopter to Children's National Medical Center in Washington, D.C. Christopher suffered a severe anoxic brain injury as a result of the near drowning. As a result, Christopher is now nonverbal, visually impaired, lacks purposeful movement of his extremities, requires a gastric feeding tube, and is dependent on constant care from others for activities of daily living.

Detective Paula Hamill conducted an investigation of the near drowning, taking notes on the condition of the pool, fence, and gate. According to Detective Hamill, "there was a lot of play in the gate, so that it allowed for a large area from the midpoint down in either direction, whether [she] was pulling it forward or towards [her] or pushing it away from [her], and [she] was able to completely put [her] leg from the waist down into that [ ] opening, how the gate bowed out." Detective Hamill reported that it did not take the "force of an

---

4. No one witnessed how Christopher got into the closed pool area.

adult" to open the gate. Detective Hamill observed that metal "crossbars" on the fence were missing in some areas and that, in those areas, she could grab the two bars and "pull them open." Detective Hamill observed a pair of shoes and a T-shirt "on the table, [ ] right inside, [ ] the first table [ ] inside the front gate." Detective Hamill noted that she did not recall any specific cuts or bruises on Christopher.[5] Detective Hamill concluded, based on her investigation, that Christopher "gained entry to the pool through the front gate."

At a deposition taken on August 10, 2011, Benjamin Alexander Beerman, Berkshire's property manager, testified that he inspected the fence surrounding the pool within a day of the incident and measured six inch spacing between the vertical posts of the fence.[6] Beerman admitted that, at the time of the near drowning, he had not yet met with CPS representatives nor did he know whether CPS was inspecting the pool three times per week.

At a deposition taken on September 29, 2011, Miles testified that, either on the day of the near drowning or the day after, she completed an "Owner's Inspection Report" recommending that the fencing around the pool be repaired so that there were no "breaks" or gaps in the fencing. Miles testified that, at some point after the near drowning, she learned that the pool barrier had been "painted and repaired."

In a "Professional Report" prepared on July 26, 2011, Dr. William N. Rowley, Ph.D., P.E., of Rowley International Inc., an aquatic design, engineering, and consulting firm, concluded that Country Place has "one of the most inadequate swimming pool barrier systems [he had] seen in over 40 years of professional swimming pool design practice." Dr. Rowley visited the

---

**5.** Officer David Magnelli, an officer who responded to the scene the day of the near drowning, also did not recall seeing any cuts, bruises, or other injuries to Christopher when he arrived at the pool. According to Officer Magnelli, there was no evidence discovered indicating that Andre assisted Christopher with accessing the pool area.

**6.** At the time of the near drowning, Christopher's head was approximately 5.1 inches wide.

Country Place pool on July 15, 2011, and, at that time, "a sphere of 4 inches could be passed through EVERY opening in the fence that [he] tested near the gate[.]" Dr. Rowley observed that, at the time of the near drowning, "each of the 1½″ posts in the ... fence had a 5½″ gap on either side, through which ... Christopher [ ] could have easily passed[.] Christopher['s] head width was only 5-1/8″." Dr. Rowley further observed that, at the time of the near drowning, "one of the 3/4″ vertical bars in the fence was not riveted at its midpoint and was sufficiently movable to allow a 7″ gap through which [ ] Christopher [ ] could have easily passed[.]"

### (c) The Complaint and Answers

On December 17, 2010, appellant filed a complaint naming appellees as defendants,[7] alleging negligence *per se*, negligence, and recovery of medical expenses.[8] As to negligence *per se*, in the complaint, appellant alleged that appellees failed to comply with Code of Maryland Regulations ("COMAR") 10.17.01.01 *et seq.*, Montgomery County Code ("Mont.Co. Code") § 51–1 *et seq.*, and Code of Montgomery County Regulations ("COMCOR") 51.00.01 *et seq.* Appellant alleged that Christopher was a member of the class of persons to be protected by COMAR, the Montgomery County Code, and COMCOR, that his injuries were of the type the regulations and statutes were intended to protect against, and that appel-

---

7. The complaint originally listed Second Blackburn Limited Partnership as the owner of Country Place. On November 8, 2011, the parties filed a Stipulation of Substitution of Party, substituting Blackburn Limited Partnership d/b/a Country Place Apartments for Second Blackburn Limited Partnership, stating that Blackburn Limited Partnership was actually the owner of Country Place and the pool. On November 15, 2011, the circuit court issued an Order that " 'Blackburn Limited Partnership d/b/a Country Place Apartments' be substituted for 'Second Blackburn Limited Partnership' as a Defendant for all purposes[.]"

8. The complaint was filed initially in the Circuit Court for Baltimore City. On March 18, 2011, the Circuit Court for Baltimore City granted appellees' motion to transfer and issued an order transferring the case to the Circuit Court for Montgomery County. All references to the "circuit court" in the opinion are to the Circuit Court for Montgomery County.

lees were aware or had reason to know of the "dangerous conditions" at the pool. Appellant alleged that appellees breached their statutory and regulatory duties by, *inter alia,* failing to ensure the pool was completely enclosed by a barrier that met the statutory and regulatory requirements, and caused Christopher's injuries. Appellant requested recovery of medical expenses, alleging that she had expended and expected to continue expending significant monies to care for Christopher. Appellant ultimately requested compensatory damages in the amount of $15,000,000, plus costs and pre- and post-judgment interest.

As to negligence, appellant alleged that Christopher, as a resident, was an invitee at Country Place, and that appellees owed a duty of care to maintain the pool in a reasonably safe condition for all residents. Appellant alleged that appellees "knew or should have known that the lack of closed and/or properly secured fence gates made the pool readily accessible to children outside of operating hours while no lifeguards or other staff members were present, thereby creating a dangerous condition to persons unable to comprehend it."

On May 12, 2011, Blackburn and Berkshire filed an answer to the complaint, generally denying liability. On May 16, 2011, CPS filed an answer to the complaint, generally denying liability.[9]

---

9. On October 20, 2011, CPS filed a third party complaint against Blackburn for indemnity and contribution, and a cross-claim against Blackburn and Berkshire for indemnity and contribution. On November 22, 2011, CPS filed a motion for summary as to indemnity against Blackburn, accompanied by a statement of undisputed facts and a memorandum in support. On November 28, 2011, Blackburn and Berkshire filed an answer to the cross-claim. On December 7, 2011, Blackburn and Berkshire filed a cross-claim against CPS for indemnity and contribution. On December 12, 2011, Blackburn and Berkshire filed an opposition to CPS's motion for summary judgment as to indemnity. On the same day, Blackburn and Berkshire filed a motion to sever cross-claims, arguing that the claims between and among them and CPS should be severed from appellant's claims against Blackburn, Berkshire, and CPS. On December 16, 2011, CPS filed a reply in support of its motion for summary judgment as to indemnity against Blackburn. On December 27, 2011, appellant filed an opposition to the

### (d) Motions for Summary Judgment

On November 30, 2011, CPS and Berkshire and Blackburn filed motions for summary judgment as to the claims asserted by appellant, arguing that they owed no duty to Christopher because he was a trespasser. CPS argued that the only duty owed to a trespasser is to "refrain from willfully or wantonly injuring or entrapping that person[,]" and that no evidence demonstrated CPS acted in a willful or wanton manner causing Christopher injury.

Blackburn and Berkshire contended that, although Christopher was an invitee while on the playground, he became a trespasser at the pool as he "penetrated the pool barrier" when the pool was closed and locked. Like CPS, Blackburn and Berkshire asserted that the only duty they owed to Christopher, a trespasser, was to " 'abstain from willful or wanton misconduct and entrapment[,]' " and that there was no evidence that they acted with willful or wanton misconduct. (Citation omitted). Blackburn and Berkshire maintained that Christopher's injuries were caused by superseding negligent acts of others—namely, that Christopher was allowed to play outside without proper supervision.

As to alleged statutory and regulatory violations, in the motion for summary judgment, Blackburn and Berkshire contended that the current applicable statutes and regulations "were not enacted when th[e] pool fence was constructed and no statute or regulation require[d Blackburn and Berkshire] to bring the pool barrier into compliance with the more recent regulations." Blackburn and Berkshire argued that, aside from any alleged statutory and regulatory violations, the violations did not create a duty to Christopher because he was a trespasser.

On December 16, 2011, appellant filed a consolidated opposition to the motions for summary judgment and a statement of

---

motion to sever cross-claims. On January 3, 2012, CPS filed an answer to the cross-claim asserted against it by Blackburn and Berkshire.

material facts in dispute. In the opposition, appellant contended that summary judgment was inappropriate because:
(1) the status of the parties was that of landlord (or landlord's agent) and tenant; (2) [appellees] owed a duty to maintain the pool barrier in a reasonably safe condition for their tenants; (3) [appellees] owed statutory and regulatory duties to prevent children from entering the pool when it was closed; (4) [appellees] negligence was the proximate cause of Christopher's injuries; and (5) Blackburn and Berkshire concede[d] that Christopher's status on the property [was] a question of fact for the jury.[10]

As to Christopher's status, appellant contended that Christopher, as a tenant, was an invitee to whom appellees owed a duty of care. As to a regulatory duty, appellant argued that appellees were required to comply with statutory and regulatory provisions governing pool barriers, including a requirement that the barrier not allow passage of a sphere four inches in diameter.

On January 3, 2012, CPS filed a reply in support of its motion for summary judgment against appellant. CPS argued that negligence based on an alleged statutory violation requires that the injured person, at the time of the injury, have "the right to be on the property of the defendant[,]" *i.e.* not be a trespasser. (Citation and internal quotation marks omitted). CPS maintained that it had "no liability under the statutes and regulations because it had no responsibility for the pool barrier."

On January 3, 2012, Blackburn and Berkshire filed a reply in support of their motion for summary judgment as to the claims asserted by appellant. Blackburn and Berkshire argued that they were not required to comply with COMAR provisions regulating spacing between vertical fence rails be-

---

**10.** Appellant argued that, in an opposition to CPS's motion for summary judgment as to indemnity, Blackburn and Berkshire maintained that Christopher's "status on the premises for purposes of liability [is an] issue[ ] of fact that can only be determined after a full trial on the merits[.]" (Italics omitted).

cause the pool and fence were constructed in 1978 and the regulations allegedly violated were enacted in 1997.

### (e) Summary Judgment Hearing

On January 19, 2012, the circuit court held a hearing on the motions for summary judgment. During the hearing, as to the alleged regulatory violation, counsel for Blackburn and Berkshire argued, in part, as follows:

> The legislative history and the regulation itself are very clear that they do not apply[.] . . .
>
> Everybody knows this incident occurred. Montgomery County Health Department knows this incident occurred. . . . Berkshire has never been cited for the pool being not in compliance with COMAR regulations, because it's not required to be. It's grandfathered under the law, and the regulations simply don't apply.

At the conclusion of the hearing, the circuit court took the motions under advisement, and acknowledged that other issues, including the motion to sever, remained pending.

### (f) The Circuit Court's Order and Memorandum Opinion

On January 26, 2012, the circuit court issued an Order granting appellees' motions for summary judgment, finding CPS's motion for summary judgment as to indemnity moot, and finding Blackburn's and Berkshire's motion to sever cross claims moot. On the same day, the circuit court issued a Memorandum Opinion, finding that Christopher was a trespasser to whom appellees owed only a duty to "abstain from willful or wanton misconduct or entrapment." The circuit court found that "[t]here was no evidence . . . that [appellees'] actions rose to the level of willful and wanton misconduct[,]" and that, therefore, appellees "did not breach a duty." As to statutory code violations, the circuit court ruled as follows:

#### STATUTORY CODE VIOLATIONS

[Appellant] argue[s] that [appellees] violated statutes and regulations governing public swimming pools, including *Code of Md. Regs.* ("COMAR") 10.17.01.21 (2010), *Mont-*

*gomery Code* § 51–15 (2010), and COMCOR 51.00.01.03. These regulations are designed to protect and promote public health and safety of individuals at public pools in Maryland. However, a potential violation of a statutory regulation is relevant only if the Court found that [appellees] owed duty beyond that of a trespasser. As explained above, [appellees] did not owe any duty to Christopher, other than to avoid willful or wanton misconduct or entrapment.

[Appellant] offer[s] an additional argument in relation to the statutory duties allegedly imposed on [appellees]—that their violations set forth a *prima facie* case of negligence. Courts have found *prima facie* cases of negligence when a plaintiff demonstrates a "violation of a statute or ordinance designed to protect a specific class of persons ... [including] the plaintiff, and ... that the violation proximately caused the injury complained of." The violation claimed by [appellant] is [appellees'] failure to ensure that the Country Place pool was enclosed by a barrier with a locked entrance that does not allow passage of a sphere four (4) inches in diameter. *See* COMAR 10.17.01.21.

The Country Place pool was built in 1978 and COMAR 10.17.01.21 became effective on February 10, 1997. [Appellant] contend[s] that the Code required some pre-existing pools to comply with the new requirements and that the Country Place pool was one of them. The Court disagrees.

COMAR 10.17.01.03B states that the owner of a pool in existence prior to the enactment of the regulations "shall maintain the pool or spa, including appurtenant structures and equipment as originally approved." Nothing in this subsection requires the owners of the Country Place pool to bring the enclosure into compliance with the later-enacted regulations. Furthermore, COMAR 10.17.01.03E enumerates several safety requirements which are *not* exempt from the new regulations. The required barriers, as defined in COMAR 10.17.01.21, are not included in that list of required updates. Therefore, the Court finds that even if Christopher was an invitee when he circumvented the pool, the

subsequent duty analysis would not include the application of the COMAR regulations as they did not require Country Place pool to meet those new standards.

Finally, a *prima facie* case of negligence also requires the finding that the violation of a regulation was the proximate cause of the injury. While this analysis is not required under the instant facts, the Court finds that the mere existence of the fence, without more, is not the core conduct within this cause of action for negligence. Without a scintilla of evidence demonstrating exactly how Christopher circumvented the fence, the Court cannot consider a possible violation as *prima facie* evidence of negligence.

### CONCLUSION

The reality of this case is that a tragic accident occurred on June 13, 2010 and the Court deeply sympathizes with the entire Paul family. But the facts do not dictate the application of the law, and the law in this situation is clear. Christopher's legal status when he entered the pool enclosure was that of a trespasser. [Appellees'] duty owed him was to prevent any willful or wanton misconduct, a situation that the facts do not support.

(Some internal citations omitted) (some alterations and omissions in original).[11]

---

11. On February 7, 2012, CPS filed a motion to alter or amend the judgment, arguing that the circuit court "mistakenly declare[d] CPS' motion for summary judgment as to a defense and indemnity as moot[.]" On February 14, 2012, the circuit court issued an Order striking the reference in the summary judgment order that CPS's motion for summary judgment as to indemnity was moot, and ordering that a hearing be scheduled to address the motion for summary judgment as to indemnity. On February 14, 2012, appellant filed a notice of appeal. On February 24, 2012, CPS filed a line withdrawing the motion. On February 27, 2012, appellant filed a second identical notice of appeal. On March 14, 2012, the circuit court held a hearing on the motion for summary judgment as to indemnity, granting the motion in favor of CPS against Blackburn and Berkshire. The March 14, 2012, docket entry notation reads, in part, "FINAL DISPOSITION (ALL ISSUES RESOLVED)."

On March 21, 2012, appellant filed a supplemental notice of appeal, appealing "all appealable issues." [12]

## STANDARD OF REVIEW

We review a trial court's grant of a motion for summary judgment *de novo*. *Town of Oxford v. Koste,* 204 Md.App. 578, 585, 42 A.3d 637 *cert. granted,* 427 Md. 606, 50 A.3d 606 (2012). Maryland Rule 2–501 governs summary judgment and authorizes summary judgment where "there is no genuine dispute as to any material fact" and "the party is entitled to judgment as a matter of law." In reviewing a grant of summary judgment under Rule 2–501, an appellate court will "independently review the record to determine whether the parties properly generated a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." *Reiter v. Pneumo Abex, LLC,* 417 Md. 57, 67, 8 A.3d 725 (2010) (citation omitted). "In order for there to be disputed facts sufficient for us to hold that granting summary judgment . . . was error, there must be evidence on which the jury could reasonably find for appellant." *Benway v. Md. Port Admin.,* 191 Md.App. 22, 46, 989 A.2d 1239 (2010) (citation omitted). In reviewing the facts, "we construe the facts properly before the court and any reasonable inferences that may be drawn from them, in the light most favorable to the non-moving party[.]" *Id.* (citation omitted).

## DISCUSSION

## C.

### (1) Contentions

Appellant contends that the circuit court erred in granting summary judgment and in finding COMAR 10.17.01.21 not applicable to the pool. Appellant argues that both state and

12.  Although Blackburn and Berkshire were represented jointly by counsel before the circuit court, and CPS was represented by different counsel before the circuit court, all three are represented by the same counsel before this Court and have filed a joint appellees' brief.

county regulations "impose explicit gate and barrier restrictions to promote safety and prevent unauthorized entry into pool areas." Appellant asserts that appellees failed to comply with COMAR as the pool barrier permitted passage of an object larger than a four inch sphere. Appellant maintains that under the Montgomery County Health Department, "the pool barrier was required to be in compliance with COMAR and COMCOR." Appellant points out that the grandfathering provision contained in COMAR—COMAR 10.17.01.03A—exempted only seven specific areas from compliance, and those areas did not include gates and barriers. Appellant contends that although COMAR 10.17.01.03E sets forth certain regulations from which previously-approved pools are not exempted from compliance, a reading of the regulation does not lead to the conclusion that previously-approved pools need not comply with COMAR 10.17.01.21. By way of example, appellant asserts that, under the circuit court's reasoning, other provisions not specifically mentioned in COMAR 10.17.01.03A or E, would not apply, including provisions that pre–1997 pools could be inspected by the Secretary of Health and Mental Hygiene.

Appellant contends that COMAR and COMCOR created statutory duties to Christopher. Appellant argues that whether Christopher was a trespasser at the time of the incident is not relevant to a determination of whether appellees were required to comply with the statutory and regulatory provisions at issue in the case. Appellant asserts that the violation of a statutory duty is presumptive evidence of negligence. According to appellant, where a plaintiff presents evidence of a statutory violation that proximately caused injury, evidence of the violation is sufficient to submit the case to the jury for a determination of the defendant's negligence.

Alternatively, appellant contends that the 1970s statutes and regulations are applicable, and those statutes and regulations "create a duty to maintain an appropriate pool barrier." Appellant argues that the circumstances in this case demonstrate that appellees failed to comply with the 1970s statutes and regulations. Appellant asserts that the sole difference

between the 1970s and 1990s statutes and regulations is that the 1997 regulation "simply put a hard number on the long-standing requirement that a pool be 'inaccessible to small children' as required by the older codes."

Aside from any statutory and regulatory duty owed, appellant contends that appellees owed Christopher, as a lawful tenant, a contractual duty to "maintain the pool barrier." Appellant asserts that appellees breached their contractual duties by, *inter alia*, failing to prevent unauthorized entry into the pool area and to adequately secure the gate to the pool. Appellant maintains that, because "Christopher was a tenant, the contractual duties existed regardless of his conduct and of common law landowner/trespasser analysis," and, accordingly, created tort liability.

As to causation, appellant contends that the circuit court erred in finding a lack of proximate causation because there was no direct evidence demonstrating the manner in which Christopher gained access to the pool area. Appellant argues that there was circumstantial evidence supporting an inference that Christopher gained access to the pool by squeezing through the gap in the loose gate. Appellant asserts that even "meager" circumstantial evidence of negligence is sufficient for the survival of summary judgment.

Appellees respond that "regulations enacted twenty years after the swimming pool and barrier were constructed d[o] not apply to the pool and do not create a duty owed by appellees that did not otherwise exist." Appellees contend that no statute or regulation required them to bring the pool barrier into compliance with the 1997 COMAR regulation. Appellees argue that COMAR 10.17.01.21, concerning pool barriers, is not included in the enumerated provisions with which an existing pool is required to comply. According to appellees, "[t]he applicable codes in 1978 [when the pool was built] were possibly the BOCA Codes of 1970 and 1975 and the Montgomery County Codes of 1971 and 1972," none of which "have any requirements concerning the permissible space between vertical rails of a fence surrounding a pool."

Appellees contend that violation of a statute as evidence of negligence applies only where a defendant owes a common law duty to the plaintiff. Appellees argue that they owed no duty to Christopher, a trespasser, and that the statutes and regulations did not create a duty to Christopher. Appellees assert that "the existence of [a] statute cannot alone create [a] duty[.]" Appellees maintain that "the 'evidence of negligence' effect of a violation of statute or regulation may be used only by one who is entitled to assert it[,]" *i.e.* not a trespasser.

As to proximate cause, appellees contend that "[a]bsent even a scintilla of evidence that [Christopher] breached the enclosure through a part of it that violated a regulation, no such theoretical violation can be used as evidence of negligence."

### (2) Law

#### (a) 1970s Statutes and Regulations

The Laws of Montgomery County, 1971, Chapter 105, governing swimming pools in Montgomery County, became effective on March 10, 1971. Chapter 105–1(c) defines a public swimming pool as "[a]ny swimming pool, except a private swimming pool, which is intended to be used collectively by numbers of persons for swimming, diving, wading or recreational bathing." The Laws of Montgomery County, 1971, Chapter 105–2(a) provides that "[a]ll physical standards required by this Chapter shall apply to all public swimming pools constructed after the effective date[.]" Chapter 105–12, governing swimming pool gates and doors, stated:

> **There shall be securely affixed to the fence, wall or other enclosure of every outdoor public and private pool a gate, door or other such closure designed to prevent accidental or unauthorized entry.** Each such gate or door shall be equipped with an appropriate self-closing or latching device situated on the pool side of the said gate or door at a height of not less than thirty-six inches from the ground, except that a built-in lock may present its key slot to the outside.

**All fences and gates shall be maintained in good condition** and all gates, doors and closures shall be closed, and latched when the pool is not in use. These requirements shall apply to both new and existing outdoor swimming pools within Montgomery County, provided that the owner of an existing pool shall have a reasonable time for compliance, but in no event to exceed one hundred eighty days from the effective date[.]

(Emphasis added).

The Laws of Montgomery County, 1971, Executive Regulation No. 3–71, effective March 10, 1971, entitled "Manual on Public Swimming Pool Construction," states that "[a]ny swimming pool built in accordance with detailed requirements contained in this manual shall be deemed to have met the requirements for Physical Standards of Chapter 105, ... entitled 'Swimming Pools.'" Executive Regulation No. 3–71 Section III(B) provides, in pertinent part:

The construction requirements of the Physical Standards shall have been satisfied when:

(1) **All outdoor swimming pool areas are enclosed by an ornamental wire, wood stave, or other type barrier designed so as to minimize the possibility of unauthorized or unwary persons entering the pool area.** Entrances through the barrier are provided with gates having locks and are located so that the points of access for the users of the pool through the barrier or from the bathhouse are on a part of the pool deck adjacent to water having a depth of not more than 4–feet. The barrier is not less than 72–inches in height, measured on the outside, and 42–inches in height, measured on the inside; except at pools located on the premises of a motel or motor court used exclusively by owners, employees and guests of such establishments and at pools located on the grounds of clubs, camps, and similar establishments where the pool is an ancillary feature of the entire operation and is located on spacious grounds away from population centers, where it needs to be only 42″ in height, measured from the deck. A gate, at least 42–

inches wide, is provided in the fence for direct emergency access to the deck area.

(Emphasis added).

Section 51–1 of the Mont. Co.Code of 1972 defines a public swimming pool as "[a]ny swimming pool, except a private swimming pool, which is intended to be used collectively by numbers of persons for swimming, diving, wading or recreational bathing." Mont. Co.Code of 1972 § 51–3(a) provides that "[a]ll physical standards required by this chapter shall apply to all public swimming pools constructed after the effective date of this chapter[,]" which was March 10, 1971. Section 51–16 of the Mont. Co.Code of 1972, governing swimming pool gates and doors, provides:

**There shall be securely affixed to the fence, wall or other enclosure of every outdoor public and private pool a gate, door or other such closure designed to prevent accidental or unauthorized entry.** Each such gate or door shall be equipped with an appropriate self-closing or latching device situated on the pool side of the gate or door at a height of not less than thirty-six inches from the ground; except, that a built-in lock may present its key slot to the outside.

**All fences and gates shall be maintained in good condition** and all gates, doors and closures shall be closed, and latched when the pool is not in use. These requirements shall apply to both new and existing swimming pools within Montgomery County; provided, that the owner of an existing pool shall have a reasonable time for compliance, but in no event to exceed one hundred eighty days from the effective date of this chapter[, March 10, 1971].

(Emphasis added).

The Building Officials & Code Administrators ("BOCA") Basic Building Code of 1970 Section 429.2 defines swimming pools as follows:

Any constructed pool which is used, or intended to be used, as a swimming pool in connection with a single family residence and available only to the family of the householder

and his private guests shall be classified as a private swimming pool.

Any swimming pool other than a private swimming pool shall be classified as a public or semi-public swimming pool.

Section 429.83 of the 1970 BOCA Basic Building Code, entitled "Swimming Pool Safety Devices," provides:

**Every person owning land on which there is situated a swimming pool,** ... which constitutes an obvious hazard and contains twenty-four (24) inches or more of water in depth at any point, **shall erect and maintain thereon an adequate enclosure either surrounding the property or pool area, sufficient to make such body of water inaccessible to small children.** Such enclosure, including gates therein, must be not less than four (4) feet above the underlying ground; all gates must be self-latching with latches placed four (4) feet above the underlying ground or otherwise made inaccessible from the outside to small children.

A natural barrier, hedge, pool cover or other protective device approved by the governing body may be used so long as the degree of protection afforded by the substituted devices or structures is not less than the protection afforded by the enclosure, gate and latch described herein.

(Emphasis added).

The BOCA Basic Building Code of 1975 Section 428.2 similarly classifies pools as follows:

Any constructed pool which is used, or intended to be used, as a swimming pool in connection with a single family residence and available only to the family of the householder and his private guests shall be classified as a private swimming pool. Any swimming pool other than a private swimming pool shall be classified as a public or semi-public swimming pool.

Section 428.8.3, entitled swimming pool safety devices, provides:

**Every person owning land on which there is situated a swimming pool,** ... which constitutes an obvious hazard

and contains twenty-four (24) inches or more of water in depth at any point, **shall erect and maintain thereon an adequate enclosure either surrounding the property or pool area, sufficient to make such body of water inaccessible to small children.** Such enclosure, including gates therein, must be not less than four (4) feet above the underlying ground; all gates must be self-latching with latches placed four (4) feet above the underlying ground or otherwise made inaccessible from the outside to small children.

A natural barrier, hedge, pool cover or other protective device approved by the governing body may be used so long as the degree of protection afforded by the substituted devices or structures is not less than the protection afforded by the enclosure, gate and latch described herein.

(Emphasis added).

### (b) 1990s Statutes and Regulations

COMAR 10.17.01.00 *et seq.* became effective on February 10, 1997. COMAR 10.17.01.01, concerning public swimming pools and spas, provides that the "purpose of this chapter is to enact regulations that protect and promote the public health and safety of individuals at public ... pools in Maryland. Public pools include limited public-use pools, recreational pools, and semipublic pools." COMAR 10.17.01.05B(19)(f)(v) defines, in part, a "recreational pool" as a pool that is provided by, or used by an "apartment complex, housing subdivision, or mobile home park with more than ten units[.]" COMAR 10.17.01.12, entitled "Conflict of Regulations," provides that an owner shall comply with:

A. The provision that establishes a higher standard for the promotion and protection of public health and safety if a provision of this chapter is in conflict with a local code, ordinance, statute, or other regulation; and

B. This chapter if there is a conflict between this chapter and the provisions of the American National Standard for Public Swimming Pools[.]

COMAR 10.17.01.13, entitled "Standards for Recreational and Semipublic Pools," provides as follows:

An owner shall ensure that an existing, newly built, or altered recreational or semipublic pool is in compliance with:

A.   This chapter;

B.   Applicable State and local codes;  and

C.   The American National Standard for Public Swimming Pools.

COMAR 10.17.01.05B(3) defines a "barrier" as "a fence or wall or a combination of a fence and wall that completely surrounds and obstructs access to the pool or spa."  COMAR 10.17.01.21, concerning barriers, provides, in relevant part, as follows:

A.   Except as set forth in §§ B, C, and D of this regulation,[13] an owner shall ensure that a recreational pool, semipublic pool, ... including the required deck area, is completely surrounded by a barrier that complies with the following requirements:

(1) The top of the barrier is at least 72 inches above grade measured on the side of the barrier that faces away from the pool or spa;

(2) The maximum vertical clearance between grade and the bottom of the barrier is 4 inches measured on the side of the barrier that faces away from the pool or spa;

(3) **Except when the entrance gate is open, an opening in the barrier and in the gate does not allow passage of a sphere 4 inches in diameter;**

(4) Fence pickets have a maximum separation of 4 inches;

. . .

(10) The barrier main access gate:

(a) Is located toward the shallow end of a pool;

---

13.   Section B applies to barriers for semipublic pools or spas.  Section C states that an owner of a pool and spa, or multiple pools or spas, may surround the pools and spas with one barrier instead of separate barriers.  Section D applies to barriers for wading or infant pools.  *See* COMAR 10.17.01.21B–D.

(b) Has a latch release located at least 54 inches from grade level;

(c) Is lockable;

(d) Is hung to open away from the pool or spa;

(e) Has a minimum width of 4 feet;  and

(f) Complies with Regulation .37 of this chapter;  and

(11) Doors and windows that open into the pool ... are enclosed by the barrier have locks or latches to prevent unauthorized entry.

(Emphasis added).

Mont. Co.Code § 51–1(j) defines a public swimming pool as "[a] swimming pool, except a private swimming pool, which is intended to be used collectively by numbers of persons for swimming, diving, wading, or recreational bathing." A private swimming pool, conversely, is defined as a swimming pool that is "(1) built on the grounds of single-family private residence; and (2) used solely by the owner, immediate family, tenants, and guests." Mont. Co.Code § 51–1(h). Mont. Co.Code § 51–1(d) defines the owner of a swimming pool as "[a]ny person, cooperative, association, partnership, firm, corporation, public agency, or authorized agent of any of them, excluding a pool management company, under whose authority a swimming pool or private spa is being constructed, remodeled, reconstructed, or operated." A pool management company, in turn, is defined as "[a]ny person, cooperative, association, partnership, firm, or corporation, excluding a pool operator, who is responsible by contract or other agreement with the owner of a public swimming pool for the operation of the public swimming pool[.]" Mont. Co.Code § 51–1(e). Mont. Co.Code § 51–3(a), concerning the scope of the chapter, provides that "[a]ll physical standards required by this chapter shall apply to all public swimming pools constructed after the effective date of this chapter." The Editor's Note to Mont. Co.Code § 51–3 states that the chapter became effective March 10, 1971. Mont. Co.Code § 51–8(a)(3) provides that "[p]ublic swimming pools shall be operated: ... [t]o eliminate hazards to the health and safety of bathers and

occupations due to: a. Unsafe conditions, and b. Unsafe practices."

Swimming pool enclosures are covered under Mont. Co. Code § 51–15, which provides, in pertinent part, that public swimming pools must be permanently enclosed, as follows: "A public pool must be enclosed as required by the manual of public swimming pool construction." Mont. Co.Code § 51–15(b)(2).[14] The Manual of Public Swimming Pool Construction is contained in COMCOR 51.00.01 *et seq.*[15] As for fencing requirements, COMCOR 51.00.01.03(B) provides, in relevant part:

1. **All outdoor swimming pool areas must be enclosed by an ornamental wire, wood stave or other type of barrier designed so as to minimize the possibility of unauthorized or unwary persons entering the pool area.** Entrances through the barrier must be provided with gates having locks and must be located so that the points of access for the users of the pool, through the barrier or from the bathhouse, are on a part of the pool deck adjacent to the shallow area. The fence or barrier must not be less than 72 inches in height, measured on the outside, and 42 inches in height, measured on the inside. The Approving Authority may grant an exemption from the barrier being 72 inches in height where the pool is an ancillary feature of the entire operation and is located on spacious grounds away from

---

**14.** The Editor's Note to Mont. Co.Code § 51–15 states:
Section 3 of FY 1991 L.M.C., ch. 1, reads as follows:
"Sections 51–15(b)(1) [concerning permanent enclosures of private swimming pools] and 51–16 [concerning pool fences, gates, and locks of private swimming pools] apply only to a pool for which the building permit application is submitted after the effective date of this law (July 13, 1990)."

**15.** COMCOR 51.00.01.01 defines a public swimming pool the same as in Mont. Co.Code § 51–1(j), namely, as "[a]ny swimming pool, except a private swimming pool, which is intended to be used collectively, by numbers of persons for swimming, diving, wading or recreational bathing." COMCOR 51.00.01.01, similarly defines a private swimming pool as "[a]ny swimming pool built on the grounds of a single family residence and used solely by the owner, immediate family, tenants, and guests."

population centers. If an exemption is granted, the fence or barrier must not be less than 42 inches in height, measured from the deck. A lockable gate, at least 42 inches wide, must be provided in the fence or barrier for direct emergency access to the deck area.

(Emphasis added).

### (c) Adoption and Applicability of the 1997 COMAR Regulations

On April 25, 1995, the American National Standards Institute (the "ANSI") and National Spa & Pool Institute (the "NSPI") approved new American National standards for residential inground swimming pools. In Appendix E, entitled Model Barrier Code for Residential Swimming Pools, Spas and Hot Tubs, the ANSI and NSPI set forth the following "Preamble to NSPI Model Child Protection/Barrier Code":

Protecting young children from accidental drownings and near-drownings in all aquatic environments, whether natural or constructed, is a primary concern of parents, the aquatic industry, health and safety organizations and regulatory groups.

. . .

While supervision is the key to accomplishing the objective of reducing the number of submersion incidents, it is well-known that, at times, children may do the unexpected, catching their supervisors off guard. But being caught off guard does not have to mean being unprepared. For those instances when the unexpected does occur and there may be a lapse in supervision, the [NSPI] has developed the Model Child Protection/Barrier Code. This Model Code establishes layers of protection to supplement and complement the requirement for constant adult supervision of young children around aquatic environments.

This is a multipurpose document, intended to meet the need of Code groups, local governments or building departments, where necessary, in the development and promulgation of barrier criteria for residential swimming pools, spas and hot tubs.

The Scope of the Model Barrier Code was stated as follows: "These requirements establish layers of protection for young children against the potential for drowning and near drowning in residential swimming pools, spas and hot tubs by limiting or delaying their access to swimming pools, spas, and hot tubs." The Purpose of the Model Barrier Code stated:

The objective of these requirements is to establish provisions that address supervision, the foremost deterrent to a young child's access to a pool, spa or hot but and to potential accidental drowning, both at times when a pool, spa or hot tub is in use, and at times when it is not in use.

Additionally, in the event of a lapse in adult supervision, and particularly for the protection of children in the most at-risk age group, less than five (5) years of age, who cannot yet appreciate or be instructed as to the risk of drowning, supplemental layers of protection are established. They limit or delay child access to an outdoor or an indoor pool, spa or hot tub from the surrounding area and to an outdoor or an indoor pool, spa or hot tub from within a building or dwelling where walls of the building or dwelling are the barrier, or part of the barrier, to the pool, spa or hot tub.

In light of the scope and purpose of the Model Barrier Code, the ANSI and NSPI adopted the following requirements:

Where a picket/ornamental fence is provided as the barrier, the horizontal open-air spacing between pickets shall be a maximum of four inches (4") (102mm) between all vertical pickets and support posts. Where a picket/ornamental type fence is provided, the maximum vertical opening between grade and the lowest part of the horizontal bottom rail of the fence shall not exceed a maximum of four inches (4") (102mm).

. . .

[ ] Where the barrier is composed of horizontal and vertical members and the distance between the tops of the horizontal members is forty-five inches (45") (1.1m) or more, spacing between vertical members shall not exceed four inches (4") (102mm).

. . .

Where a picket/ornamental-type fence is provided, maximum open air spacing between all vertical pickets and support posts (vertical) and between the top rail of the pool and the lower horizontal bottom rail of the fence shall not exceed four inches (4″) (102mm). A sphere greater than four inches (4″) (102mm) shall not pass through openings in the fence.

On July 7, 1995, the Maryland Register published a Notice of Proposed Action proposing adoption of new regulations to be contained at COMAR 10.17.01. Proposed Action on Regulations, 22:14 Md. Reg. 1067 (July 7, 1995). In the Statement of Purpose, the Notice of Proposed Action stated:

The purpose of this action is to enact regulations that protect and promote the public health and safety of individuals at public and semipublic swimming pools and spas, and limited public-use pools in Maryland.

These regulations set minimum standards for the design, equipment, operation, installation, construction, and alteration of public and semipublic pools and spas and limited public-use pools.

... This chapter adopts rationally recognized standards for public pools, public spas, and public pool and spa circulation system components and piping.

*Id.* As to the summary of the economic impact of the new regulations, the Notice of Proposed Action explained:

The economic impact should be minimal due to the grandfathering of existing public pools and spas and the creation of the semipublic pool classification of pools and spas at hotels, motels, condominiums, and similar facilities. Pools and spas at facilities with up to four private residences are exempt from these regulations. Although there will be an increased cost to owners of some pools and spas for safety personnel and to meet updated standards, these increases have been minimized. The public should have greater protection of health and safety, resulting in reduced illness and injury.

*Id.* In a section titled "Assumptions" under the Estimate of Economic Impact, the impact on owners of public pools and spas is described as follows:

The impact on owners of existing pools and spas should be insignificant due to a grandfathering provision in Regulation .03. Certain pool or spa owners may have an increased cost in order to comply with Regulation .40 which requires safety rescue equipment to be on site. Public pools will be required to have a minimum number of lifeguards and CPR certified personnel on site; however, most public pools currently have these personnel. A new classification of pools termed semipublic is not required to have lifeguards on site and need only provide minimal safety equipment. This dramatically lessens the impact on hotels, motels, condominiums, marinas, and other facilities. Semipublic pools and spas also have different standards than public pools regarding operation, safety, and structures, which alleviates any economic impact to the semipublic facilities. Certain pool and spa owners will have a significant, nonquantifiable reduction in operating and construction costs for bathhouse facilities under Regulation .35 which allows the use of existing toilets, sinks, and showers in an equivalent facility. Any potential economic impact may be spread out through the use of a compliance schedule as provided in Regulation .52.

*Id.* at 1068. In the Assumptions, the Secretary of Health and Mental Hygiene further observed that "[t]he public may have significant, nonquantifiable savings as a result of decreased illness and injury at public pools and spas." *Id.*

It was proposed that COMAR 10.17.01.21A(3) require a pool barrier to comply with the requirement that "[e]xcept when the entrance gate is open, an opening in the barrier and in the gate does not allow passage of a sphere 4 inches in diameter[.]"[16] *Id.* at 1074. On June 21, 1996, COMAR

---

**16.** In an undated document entitled "Safety Barrier Guidelines for Home Pools," published by the U.S. Consumer Product Safety Commis-

10.17.01.21A(3) was re-proposed in identical form. Proposed Action on Regulations, 23:13 Md. Reg. 962 (June 21, 1996). On January 31, 1997, the Maryland Register published a Notice of Final Action, which stated:

> On January 13, 1997, the repeal of Regulations .01–.12 under COMAR 10.17.04 Public Swimming Pools and new Regulations .01–.54 under a new chapter, COMAR 10.17.01 Public Swimming Pools and Spas were adopted by the Secretary of Health and Mental Hygiene. This action, which was originally proposed for adoption in 22:14 Md. R. 1067–1084 (July 7, 1995), and reproposed with substantial changes in 23:13 Md. R. 959–964 (June 21, 1996), has been adopted with the nonsubstantive change shown below.[17]

> Effective Date: February 10, 1997.

Final Action on Regulations, 24:3 Md. Reg. 187 (January 31, 1997).

COMAR 10.17.01 *et seq.* was thus adopted and became effective on February 10, 1997. COMAR 10.17.01.01, outlining the purpose and scope of the chapter, provides:

> A. The purpose of this chapter is to enact regulations that protect and promote the public health and safety of individuals at public spas and pools in Maryland. Public pools include limited public-use pools, recreational pools, and semipublic pools. Public spas include semipublic spas.

> B. This chapter adopts construction standards, updates disinfection standards, recognizes certain new technologies

---

sion, (the "CPSC") and attached to appellant's consolidated opposition to appellees' motions for summary judgment as Exhibit 30, the CPSC stated that "[a] successful pool barrier prevents a child from getting OVER, UNDER, or THROUGH and keeps the child from gaining access to the pool except when supervising adults are present." For fence pool barriers made of horizontal and vertical members, it was recommended that the "spacing between vertical members should not exceed 4 inches[,]" as the four inch requirement was "based on the head breadth and chest depth of a young child and is intended to prevent a child from passing through an opening."

**17.** The nonsubstantive change concerned construction permits for public and semipublic pools. 24:3 Md. Reg. 187.

and design concepts, and establishes minimum criteria for public pools and spas.

COMAR 10.17.01.21A(3), regulating pool barriers, was adopted as proposed, adopting the four inch requirement for pool barriers.[18]

The new regulations also contained a "grandfathering" provision, at COMAR 10.17.01.03, entitled "Previously Approved Pools and Spas," which provides as follows:

A. Except as provided in §§ D and E of this regulation, the owner of a pool ... that was approved by the Secretary for construction before the adoption of this chapter is exempt from bringing the previously approved pool ... into compliance with:

(1) Regulations .13C, 14A(3), .17C, .18A(3), .22, .24, and .35 of this chapter; [19] and

(2) Notwithstanding any exemption set forth at § A(1) of this regulation, the diving area dimensions of Regulation .27B of this chapter if the diving area is in compliance with American National Standard for Public Swimming Pools.

B. The owner of a pool ... that was approved by the Secretary for construction before the adoption of this chapter shall maintain the pool ... including appurtenant structures and equipment as originally approved and may com-

---

18. In addition, COMAR adopted the American National Standard for Residential Inground Swimming Pools, the ANSI/NSPI 1995 report, "including Appendix E, Model Barrier Code for Residential Swimming Pools, Spas, and Hot Tubs[.]" COMAR 10.17.01.04D.

19. Regulation .13C states that recreational and semipublic pools must comply with the American National Standard for Public Swimming Pools. Regulation. 14A(3) requires public spas to be in compliance with the American National Standard for Public Spas. Regulation .17C requires public wading pools to comply with the American National Standard for Public Swimming Pools. Regulation .18A(3) requires public therapy pools comply with the American National Standard for Public Swimming Pools. Regulation .22 concerns pool decks. Regulation .24 concerns pipe material used for public pools and spas. Regulation .35 concerns the toilet, hand sink, and shower facilities at recreational pools, semipublic pools, and public spas.

plete a repair that restores the pool ... to its original condition before damage or deterioration without complying with the requirements of this chapter, except for Regulations .06C and .28 of this chapter, when the repair:

(1) Costs less than 25 percent of the replacement value of the pool or spa, including appurtenant structures and equipment;

(2) Consists of the same or equivalent materials and components having the same specifications, operating characteristics, and certifications as the original construction; and

(3) Does not create a danger or allow a danger to continue that threatens the health and safety of an individual using the pool[.]

C.  The owner of a pool ... that was approved by the Secretary for construction before the adoption of this chapter shall ensure that a repair complies with all applicable provisions of this chapter when completing a repair that:

(1) Costs more than 25 percent of the replacement value of the pool or spa, including appurtenant structures and equipment; or

(2) Alters the materials or components of the original construction.

D.  The exemptions in §§ A and B of this regulation do not apply if:

(1) The previously approved pool or spa has a condition that jeopardizes the health or safety of the public, in which case the owner shall ensure that the condition is corrected to meet the requirements of this chapter;

(2) An owner intends to alter the previously approved pool ..., including appurtenant structures and equipment, in which case the owner shall ensure that the alteration complies with the requirements of this chapter; or

(3) A suction outlet is not in compliance with Regulation .28 of this chapter, in which case the owner shall ensure that the suction outlet is repaired or altered to meet the

requirements of Regulation .28 of this chapter for suction entrapment prevention.

 E. Notwithstanding the exemptions set forth in § A of this regulation, a previously approved pool ... is not exempt from Regulations .16C, .17D, .22A(2), .26A, .26D, .26G, .27A, .27C, .27E, .28D, .40C(1), .40F(1), and .40F(2) of this chapter.[20]

COMAR 10.17.01.54, entitled "Compliance Schedules," provides, in pertinent part, that "[t]he owner of a public pool ... that has a structure, equipment, or appurtenance that is not in compliance with this chapter as determined by the Secretary may submit to the Secretary for approval a compliance schedule for meeting the requirements of this chapter." COMAR 10.17.01.54A. COMAR 10.17.01.54C provides that the Secretary may approve a compliance schedule if certain require-

---

**20.** Regulation .16C requires that a swimming pool slide conform with the American National Standard for Public Swimming Pools. Regulation .17D requires that public wading pools comply with Article 10.6 of the American National Standard for Public Spas. Regulation .22A(2) requires that pool decks at public spas conform with the American National Standard for Public Spas. Regulation .26A requires that recreational pools, semipublic pools, and public spas have circulation systems in compliance with Circulation System Components and Related Materials for Pools, Spas/Hot Tubs. Regulation .26D governs chlorine gas feeders at recreational pools, semipublic pools, and public spas. Regulation .26G governs ozone systems at recreational pools, semipublic pools, and public spas. Regulation .27A requires that pools used for accredited competitive aquatic events comply with Section 6.4.1 of the American National Standard for Public Swimming Pools. Regulation .27C requires diving equipment to comply with certain provisions of the American National Standards for Public Swimming Pools. Regulation .27E requires diving boards in excess of ten feet above the water line and diving platforms comply with certain sections of the American National Standard for Public Swimming Pools. Regulation .28D requires drain covers to comply with federal law and the American National Standard for Public Swimming Pools. Regulation. 40C (1) requires recreational pools to be equipped with lifeguard chairs in compliance with the American National Standard for Public Swimming Pools. Regulation .40F(1) requires that safety signs at public pools and spas comply with the ANSI Z–535 series of standards for Safety Signs and Colors as referenced in the American National Standard for Public Spas. Regulation .40F(2) requires a spa safety sign to be posted in a permanent location adjacent to a spa in compliance with the American National Standard for Public Spas.

ments are met, including the requirement that "[o]peration of the pool ... during the time allowed to bring the pool ... into compliance does not adversely affect the health and safety of the public."

### (d) Violation of a Statute as Evidence of Negligence

Section 285 of Restatement, Second of Torts, entitled "How Standard of Conduct Is Determined," provides:

The standard of conduct of a reasonable man may be

(a) established by a legislative enactment or administrative regulation which so provides, or

(b) adopted by the court from a legislative enactment or an administrative regulation which does not so provide,[21] or

(c) established by judicial decision, or

(d) applied to the facts of the case by the trial judge or the jury, if there is no such enactment, regulation, or decision.

Section 286 of the Restatement, Second of Torts, entitled "When Standard of Conduct Defined by Legislation or Regulation Will Be Adopted," expands upon § 285 and provides:

The court may adopt the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part

(a) to protect a class of persons which includes the one whose interest is invaded, and

(b) to protect the particular interest which is invaded, and

(c) to protect that interest against the kind of harm which has resulted, and

---

21. Comment c to Section 285 of the Restatement, Second of Torts states:

Even where a legislative enactment contains no express provision that its violation shall result in tort liability, and no implication to that effect, the court may, and in certain types of cases customarily will, adopt the requirements of the enactment as the standard of conduct necessary to avoid liability for negligence. The same is true of municipal ordinances and administrative regulations. See § 286 and Comments.

(d) to protect that interest against the particular hazard from which the harm results.

Conversely, Section 288 of the Restatement, Second of Torts, entitled "When Standard of Conduct Defined by Legislation or Regulation Will Not Be Adopted," states as follows:

The court will not adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively

(a) to protect the interests of the state or any subdivision of it as such, or

(b) to secure to individuals the enjoyment of rights or privileges to which they are entitled only as members of the public, or

(c) to impose upon the actor the performance of a service which the state or any subdivision of it undertakes to give the public, or

(d) to protect a class of persons other than the one whose interests are invaded, or

(e) to protect another interest than the one invaded, or

(f) to protect against other harm than that which has resulted, or

(g) to protect against any other hazards than that from which the harm has resulted.

Comment a to Section 288 observes: "This Section, which is a corollary to § 286, states the conditions under which the courts will not adopt the legislative or administrative standard of conduct as that of a reasonable man for purposes of a negligence action. Section 286 states the conditions under which the courts will normally adopt the standard, although, ... they are under no compulsion to do so." Section 288B(2) explains that "[t]he unexcused violation of an enactment or regulation which is not so adopted may be relevant evidence bearing on the issue of negligent conduct." [22]

---

**22.** In *Joseph v. Bozzuto Mgmt. Co.*, 173 Md.App. 305, 339–40, 918 A.2d 1230 (2007), we quoted with approval, the following discussion of the legal effect of statutory requirements on tort law:

In *Rivers v. Hagner Mgmt. Corp.*, 182 Md.App. 632, 653–54, 959 A.2d 110 (2008), *cert. denied*, 407 Md. 276, 964 A.2d 676 (2009), we explained the concept of violation of a statute as evidence of negligence:

> [T]he Court [of Appeals] stated that "violation of a statute . . . is itself sufficient to prove such a breach of duty as will sustain a private action for negligence." We elucidated the distinction[:]
>
>> To prevail in a typical negligence action, one must show "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." But, "where there is an applicable statutory scheme designed to protect a class of persons which includes the plaintiff, . . . the defendant's duty ordinarily 'is prescribed by the statute' or ordinance and that the violation of the statute or ordinance is itself of negligence."
>
> Thus, when a plaintiff alleges that a defendant's duty is established by statute, "all that a plaintiff must show is: (a) the violation of a statute or ordinance designed to protect a specific class of persons which includes the plaintiff, and (b) that the violation proximately caused the injury complained of." . . . [O]nce the violation of a statute is shown, "[p]roximate cause is established by determining whether the plain-

---

One kind of statute imposes a specific duty or a standard of care that would not exist at common law but does not otherwise change the rules for negligence, causation, defenses, and procedures. For instances, statutes may require owners to post a lifeguard at certain swimming pools, require landowners to cut weeds to enhance visibility at an intersection, or require landlords to equip premises with secure locks as protection against intruders. If a plaintiff is harmed by violation of such a statute, courts think of the plaintiff's case as an ordinary negligence case with the same issues and rules as other negligence cases except that the plaintiff proves negligence by proving violation of the statute. But because it is an ordinary negligence case, the plaintiff must also prove causation and damages, and she will lose if she fails to do so.

(Citation and emphasis omitted).

tiff is within the class of persons sought to be protected, and the harm suffered is of a kind which the drafters intended the statute to prevent. It is the existence of this cause and effect relationship that makes the violation of a statute *prima facie* evidence of negligence."

The plaintiff need not show that the defendant had knowledge of the statutory violation (although the statute itself might require knowledge in order to establish a violation). Notably, while "[t]he majority of state courts treat the violation as negligence *per se* ... Maryland is among the minority of states that treat the violation simply as evidence of negligence." Thus, once the plaintiff has presented a *prima facie* case, by introducing "evidence that the violation of the statute proximately caused the plaintiff's injury," the defendant's negligence becomes a question for the fact finder. At that point, "[t]he trier of fact must ... evaluate whether the actions taken by the defendant were reasonable under all the circumstances."

(Citations omitted) (some alterations and omissions in original).

### (e) Relevant Case Law

In *Brooks v. Lewin Realty III, Inc.*, 378 Md. 70, 72, 835 A.2d 616 (2003), a lead paint case, the Court of Appeals narrowly held that, "in the context of a tort action against a Baltimore City landlord, based upon a child's consumption of lead-based paint which was present in the form of flaking, loose, or peeling paint in the leased premises, in violation of the Housing Code, the plaintiff does not have to show that the landlord had notice of the violation to establish a *prima facie* case." The Court of Appeals observed, as an initial matter, that, "under the common law and in the absence of a statute, a landlord ordinarily has no duty to keep rental premises in repair, or to inspect the rental premises either at the inception of the lease or during the lease term." *Id.* at 78, 835 A.2d 616. An exception to that general rule, however, is where circumstances permit the violation of a statute to serve as evidence of negligence—namely, "where there is an applicable statutory

scheme designed to protect a class of persons which includes the plaintiff," such that the defendant's duty is prescribed by the statute. *Id.* (citations omitted). Under such circumstances, to establish a *prima facie* case of negligence, a plaintiff must demonstrate the violation of a statute "designed to protect a specific class of persons which includes the plaintiff," and that the "violation proximately caused the injury complained of." *Id.* at 79, 835 A.2d 616.

In *Brooks, id.* at 81, 835 A.2d 616, the Court of Appeals examined the relevant provisions of the Baltimore City Housing Code, which generally "impose[d] numerous duties and obligations upon landlords who rent residential property to tenants." One violation of the Housing Code included maintaining a residence containing flaking, loose, or peeling paint. *Id.* at 89, 835 A.2d 616. Based on the Court's review of the applicable statutes and statutory scheme, the Court determinated that the Housing Code did not make a "landlord's notice of a defective condition a factor with regard to the landlord's duty to the tenant." *Id.*

In *Joseph,* 173 Md.App. at 321–22, 327, 918 A.2d 1230, a slip-and-fall case, with Judge Charles E. Moylan, Jr. speaking for the Court, we discussed the evidentiary principle of a violation of a statute or regulation serving as evidence of negligence generally, stating:

> There must, first and foremost, be an actual violation of a statute or regulation, not simply a statute or regulation in existence that might be violated. The injury, moreover, must be of a type which the statute or regulation was specifically designed to prevent. The plaintiff must also be a member of the class that the statute or regulation was designed to protect. The violation of the statute must constitute a breach of a legally cognizable duty owed by the defendant to the plaintiff.
>
> . . .
>
> [Each] of the cases we have cited and discussed has reiterated the general principle that, *under some circumstances,*

the violation of a statute or regulation may constitute evidence of negligence.

(Citations omitted) (emphasis in original).

Upon quoting Section 285 of the Restatement, Second of Torts, we explained that courts may accept a statutory rule of conduct, stating:

[C]ourts may usually accept the statutory rule of conduct as a judicial rule for tort cases, even though the statute itself does not require it. In other words, courts are free to accept, reject, or modify the rule as applied in tort law, so long as the statute does not state or imply to the contrary.

*Id.* at 328, 918 A.2d 1230 (citation and emphasis omitted). We quoted Sections 286 and 288 of the Restatement, Second of Torts, stating that statutes or ordinances must clear a high bar before a court will hold that its violation is evidence of negligence. *Id.* at 329–30, 918 A.2d 1230. We commented generally that "courts usually refused to adopt statutory standards that were not aimed at protecting groups that included the plaintiff and those not aimed at protecting against harms of the kind suffered by the plaintiff." *Id.* at 331, 918 A.2d 1230 (citation and emphasis omitted).

In *Joseph, id.* at 309–10, 918 A.2d 1230, the plaintiff, an invitee at an apartment building where his father resided, slipped and fell on an oily substance on a stairwell landing. At issue in the case was whether the plaintiff, to sustain a cause of action in negligence against the defendants, was required to "prove not only that a dangerous condition existed but also that the [defendants] 'had actual or constructive knowledge of the dangerous condition and that the knowledge was gained in sufficient time to give [them] the opportunity to remove it or to warn the invitee.'" *Id.* at 315, 918 A.2d 1230 (citations omitted). The plaintiff, however, failed to proffer evidence demonstrating that the defendants had either actual or constructive knowledge of the oily substance on the stairwell. *Id.* at 319, 918 A.2d 1230. As such, the plaintiff argued that *Brooks* negated the notice requirement in slip and fall cases and that the defendants violated a provision of the

Montgomery County Code and that the violation of the statute was evidence of the defendants' negligence. *Id.* at 319–20, 918 A.2d 1230. We rejected both arguments.

As to the violation of the provision of the Montgomery County Code—which simply stated in "boiler-plate" language that a landlord must keep all areas of a building "in a clean, sanitary, and safe condition"—we observed that the provision was contained within a larger chapter of the Code, Chapter 29, governing landlord-tenant relations. *Id.* at 332, 918 A.2d 1230. One of the express purposes of Chapter 29 was to make "the contractual relationships between landlord and tenant more arm's length and amicable by removing as many areas of doubt or ambiguity as possible and by providing a specially designed tribunal to reconcile any differences between them." *Id.* at 332–33, 918 A.2d 1230. As such, the purpose of Chapter 29 of the Montgomery County Code was to improve relations between landlords and tenants. *Id.* at 333, 918 A.2d 1230. The chapter purported to "regulate[ ] and determine[ ] the legal rights, remedies and obligations of the parties and beneficiaries of any rental agreement concerning any rental dwelling unit located in the County." *Id.* at 334, 918 A.2d 1230 (emphasis omitted). We observed that many of the provisions of the chapter concerned "contractual obligations under the lease, not the establishment of tort liability." *Id.* Accordingly, based upon our review of the statutory scheme and provision at issue, we concluded that "[i]t could not be more clear that Chapter 29 generally, and [the statute at issue] specifically, of the Montgomery County Code did not create a civil action tort for the benefit of invitees in slip-and-fall cases." *Id.* at 335, 918 A.2d 1230.

As to the argument that *Brooks* abolished the element of notice in slip-and-fall cases, we observed that the Montgomery County Council, in enacting the chapter concerning landlord-tenant relations, in no way demonstrated an intent to abolish the element of notice in slip-and-fall cases. *Joseph,* 173 Md.App. at 338, 918 A.2d 1230. We distinguished *Brooks* as a unique case involving "exclusively with heightened landlord responsibility in Baltimore City for injuries to children caused

by loose and flaking lead paint." *Joseph*, 173 Md.App. at 341, 918 A.2d 1230. We concluded that the Court of Appeals's decision in *Brooks* "left no doubt that that case was a lead paint case and nothing but a lead paint case," thus making its abolishment of the notice requirement under very narrow circumstances inapplicable to traditional slip-and-fall cases such as the one at issue. *Joseph*, 173 Md.App. at 344, 918 A.2d 1230.

In *Allen v. Dackman*, 413 Md. 132, 137, 991 A.2d 1216 (2010), another lead paint case, the Court of Appeals held that the defendant owed a duty to the plaintiffs under the Baltimore City Housing Code, even if the plaintiffs were trespassers with no legal right to possess the property and the defendant never intended to lease the property. In *Allen, id.* at 138–39, 991 A.2d 1216, the plaintiffs resided at the property with their grandmother pursuant to the grandmother's lease. The owner of the property failed to pay property taxes. *Id.* at 139, 991 A.2d 1216. Hard Assets, a limited liability company of which the defendant was one of two members, purchased the property at tax foreclosure. *Id.* Hard Assets did not intend to lease the property and had no knowledge that the plaintiffs, or their grandmother, were residing at the property. *Id.* Once Hard Assets discovered that the plaintiffs and their grandmother were residing at the property, Hard Assets took legal action to remove them. *Id.* Exactly one year after purchasing the property at tax foreclosure, Hard Assets sold the property. *Id.* During the one year that it owned the property, Hard Assets did not receive rent and the grandmother did not pay rent or even know who Hard Assets was. *Id.* at 139–40, 991 A.2d 1216. The plaintiffs, two minor children, eventually sued Hard Assets, claiming they were exposed to lead at the property. *Id.* at 140, 991 A.2d 1216.

In *Allen, id.* at 156, 991 A.2d 1216, among other issues discussed, the Court of Appeals discussed the defendant's duty to the plaintiffs, persons "who ha[d] no legal right to possess the property." Although the defendant argued that the Housing Code was not intended to protect individuals with no legal right to possess the premises, the Court of Appeals deter-

mined that "the common law rule that a landowner owes a limited duty to those who trespass on his or her property[,]" was "inapplicable to the present case because the duty here is based on the Housing Code, not the common law." *Id.* at 157, 991 A.2d 1216 (citation omitted). The Court of Appeals concluded, upon review of the Housing Code, that the Code was intended to protect "occupants of dwellings[,]" defined as persons who "actually use[ ] or ha[ve] possession of the premises." *Id.* at 156–57, 991 A.2d 1216. As to the violation of a statute as evidence of negligence, the Court of Appeals stated:

> [The plaintiffs] are within the class of persons that the Housing Code was intended to protect, and they have alleged injuries that the statute was designed to prevent. The express purposes of the Housing Code demonstrated that the City Council intended to protect the occupants of dwellings. [The plaintiffs] are within that protected class of persons. . . . [T]he Housing Code was intended "to protect children from lead paint poisoning. . . ." [The plaintiffs'] claims are all based on harm to children that was allegedly caused by lead paint poisoning. Accordingly, we conclude that [the defendant] owed a duty to [the plaintiffs] regardless of whether [the plaintiffs] had a legal right to possess the property.

*Id.* at 157–58, 991 A.2d 1216 (citations and footnotes omitted) (second omission in original).

In *Allen*, 413 Md. at 158 n. 18, 991 A.2d 1216, in a footnote, the Court of Appeals discussed a case decided by the Supreme Court of North Carolina, *Bell v. Page*, 271 N.C. 396, 156 S.E.2d 711 (1967),[23] stating:

> The Supreme Court of North Carolina reached a similar conclusion in *Bell.* In *Bell,* the defendant failed to erect a fence around his swimming pool in violation of a municipal

---

**23.** *Bell* has since been overruled as stated in *Nelson v. Freeland,* 349 N.C. 615, 507 S.E.2d 882, 892 (1998), a case in which the Supreme Court of North Carolina abolished the distinction between invitee and licensee "in favor of modern negligence principles[,]" but "retain[ed] a separate classification for trespassers."

ordinance. A child, who was trespassing on the defendant's property, drowned in the pool. The court recognized that the defendant would have owed a limited duty to the child under the common law. Regardless, the court held that the defendant should be held to the higher duty established by the ordinance because the ordinance's "primary purpose and intent ... was to provide protection for children without reference to whether they were legally entitled to use the pool."

(Citations omitted). To the Court of Appeals's concise and accurate summary of *Bell*, we add only that, in *Bell*, 156 S.E.2d at 715, the Supreme Court of North Carolina discussed the issue of proximate cause, stating:

"What is the proximate or a proximate cause of an injury is ordinarily a question for a jury. It is to be determined as a fact from the attendant circumstances. Conflicting inferences of causation arising from the evidence carry the case to the jury."

There was evidence [in the case] from which it may be inferred that [the child] came to defendant's pool on a bicycle, wearing swim trunks, and that he either jumped or fell into an unfenced and unguarded pool where the water was ten feet deep and drowned. Under these circumstances, whether the violation of said ordinance, if such occurred, was a proximate cause of [the child]'s death is for determination by the jury.

(Citation omitted).

### (3) Analysis

### (a) Applicability of Statutes and Regulations

Returning to the case at hand, as an initial matter, we conclude that appellees' argument—that for there to be a statutory or regulatory duty, there must first be a common law duty—is without merit. In *Allen*, 413 Md. at 157, 991 A.2d 1216, a Baltimore City lead paint case, the Court of Appeals rejected the defendant's common law trespasser rule argument, stating that the rule was "inapplicable to the pres-

ent case because the duty [was] based on the Housing Code, not the common law." Similarly, in *Bell*, 156 S.E.2d at 714–15, a case involving a child trespasser who drowned in a swimming pool where the defendant had failed to erect a fence around his pool in violation of a local ordinance, the Supreme Court of North Carolina observed that although, under the common law, the defendant would owe only a limited duty to the child trespasser, the defendant would be held to the higher duty established by the ordinance because "[t]he primary purpose and intent of [the] ordinance . . . was to provide protection for children without reference to whether they were legally entitled to use the pool." [24] A review of the case law above demonstrates that a statutory or regulatory duty is not dependent upon the existence of an underlying common law duty. Indeed, duties may arise from multiple sources. We reject the premise that where a plaintiff pursues a negligence action alleging a violation of a statutory or regulatory duty, the plaintiff must first demonstrate the existence of a common law duty.

Before proceeding, we state that this Court's holding does not address, in any manner, the duty of a homeowner with a private swimming pool, as defined by the relevant statutes and regulations. Rather, the opinion concerns only the duties owed by owners of public swimming pools.

■ Under either the 1970s statutes and regulations or the 1990s statutes and regulations, appellees were required to comply with certain requirements concerning the pool barrier. Under the 1970s statutes and regulations, appellees were required to maintain "in good condition" a "fence, . . . or other

---

24. At oral argument, appellees' counsel contended that, in *Bell*, the Supreme Court of North Carolina found that the existence of a common law duty gives rise to a statutory duty. Put simply, we disagree. In *Bell*, 156 S.E.2d at 714–15, the Supreme Court of North Carolina recognized that the defendant owed the child trespasser separate duties under the common law and the ordinance. The Supreme Court of North Carolina in no way stated or implied, however, that the statutory duty would not exist if the defendant owed no common law duty to the child trespasser—*i.e.* that the statutory duty was wholly dependent upon the existence of a common law duty.

[ ] closure designed to prevent accidental or unauthorized entry" into the pool, Laws of Montgomery County, 1971, Chapter 105-12; Mont. Co.Code of 1972 § 51-16, and to enclose the pool with a "barrier designed so as to minimize the possibility of unauthorized or unwary persons entering the pool area[,]" Laws of Montgomery County, 1971, Executive Regulation No. 3-71 Section III(B). Additionally, under the 1970 and 1975 BOCA Basic Building Codes, appellees were required to "erect and maintain thereon an adequate enclosure either surrounding the property or pool area, sufficient to make such body of water inaccessible to small children." 1970 BOCA Basic Building Code § 429.83; 1975 BOCA Basic Building Code § 428.8.3.

Similarly, under the 1990s statutes and regulations, appellees were required to enclose a public swimming pool with a "barrier designed so as to minimize the possibility of unauthorized or unwary persons entering the pool area." Mont. Co.Code § 51-15(b)(2); COMCOR 51.00.01.03(B). In addition, pursuant to COMAR 10.17.01.21A(3), appellees were required to surround the pool with a barrier such that, "[e]xcept when the entrance gate is open, an opening in the barrier and in the gate does not allow passage of a sphere 4 inches in diameter[.]" Thus, the statutes and regulations from the 1970s and 1990s demonstrate that appellees, and all other owners of public swimming pools, were required to meet certain minimum standards as to the construction and maintenance of an adequate pool barrier.

As to which set of statutes and regulations applied to the pool at the time of the near drowning on June 13, 2010, the circuit court incorrectly determined that COMAR 10.17.01.21, and, specifically, the requirement that openings in the pool barrier and gate "not allow passage of a sphere 4 inches in diameter[,]" did not apply to the pool at Country Place. In its Memorandum Opinion, as to the applicability of COMAR 10.17.01.21, the circuit court stated:

COMAR 10.17.01.03B states that the owner of a pool in existence prior to the enactment of the regulations "shall maintain the pool or spa, including appurtenant structures

and equipment as originally approved." Nothing in this subsection requires the owners of the Country Place pool to bring the enclosure into compliance with the later-enacted regulations. Furthermore, COMAR 10.17.01.03E enumerates several safety requirements which are *not* exempt from the new regulations. The required barriers, as defined in COMAR 10.17.01.21, are not included in that list of required updates. Therefore, the Court finds that even if Christopher was an invitee when he circumvented the pool, the subsequent duty analysis would not include the application of the COMAR regulations as they did not require Country Place pool to meet those new standards.

Simply put, the circuit court misread the intent and applicability of COMAR 10.17.01.03.

To begin, we conclude that the pool at Country Place is a recreational pool, as that term is defined in COMAR 10.17.01.05B(19)(f)(v), as it is a pool provided by, or used by, an apartment complex consisting of more than ten units. In turn, pursuant to COMAR 10.17.01.05B(18)(b)(ii), a recreational pool is a public pool for purposes of the chapter. COMAR 10.17.01.03, a "grandfathering" provision, provides limited exemptions for previously approved pools, *i.e.* owners of previously approved pools are exempt from bringing the pools into compliance with certain specific regulations. COMAR 10.17.01.03A(1) specifically exempts previously approved pools and spas from compliance with seven regulations, including six regulations not at issue in this case, and Regulation .13C, which provides that recreational pools must comply with the American National Standard for Public Swimming Pools. Significantly, COMAR 10.17.01.03A(1) does not exempt recreational pools from complying with COMAR 10.17.01.13A and B, which mandate that owners of existing recreational pools comply with the chapter, generally, as well as with applicable State and local codes—both of which, as detailed above, set certain minimum standards concerning pool barriers, including the four inch sphere requirement for pool barriers contained in COMAR 10.17.01.21A(3).

COMAR 10.17.01.03B and C concern maintenance and repairs to previously approved pools. COMAR 10.17.01.03B permits previously approved pools to be maintained in their original condition, and to be repaired to their original condition without complying with the requirements of the chapter (with two exceptions), provided that: (1) the repairs cost less than 25% of the replacement value of the pool, (2) the materials or components used in the repair are the same or equivalent to the materials and components originally approved, and (3) repairing the pool to its original condition "[d]oes not create a danger or allow a danger to continue that threatens the health and safety of an individual using the pool[.]" [25] COMAR 10.17.01.03D(1) specifically provides that the limited exemptions detailed in sections A and B are not applicable, however, if the previously approved pool "has a condition that jeopardizes the health or safety of the public, in which case the owner shall ensure that the condition is corrected to meet the requirements of this chapter[.]" [26]

A review of the exemptions provided for in COMAR 10.17.01.03A and the mandatory regulations set forth in CO-MAR 10.17.01.03E reveals that the two provisions concern national standards promulgated for pools and spas, and whether or not compliance with the national standards is required for previously approved pools and spas under the COMAR chapter governing public swimming pools and spas. *See supra* notes 19 and 20 for a listing of the regulations referenced in COMAR 10.17.01.03A and E. Both subsections are silent as to a previously approved pool's compliance with COMAR 10.17.01.21, governing pool barriers. Read together, the subsections of COMAR 10.17.01.03, as a whole, provide that the

---

**25.** On the other hand, COMAR 10.17.01.03C requires repairs to previously approved pools where the repairs cost more than 25% of the replacement value of the pool, or alter the materials or components used in the original construction, to comply with the regulations set forth in the chapter.

**26.** COMAR 10.17.01.03E explains that previously approved pools are not exempt from complying with thirteen specifically listed regulations, none of which are at issue in this case.

limited exemptions set forth in COMAR 10.17.01.03A do not apply if a condition exists that poses a threat to the health or safety of an individual or the public.

For the reasons explained above, we conclude that, pursuant to COMAR 10.17.01.03, previously approved pools are required to comply with COMAR 10.17.01.21 and COMAR regulations not specifically exempted by subsection A, in circumstances where a condition exists that poses a danger that threatens the health and safety of pool users. In concluding otherwise, the circuit court failed entirely to consider subsection A and that previously approved recreational or public swimming pools were not exempted from complying with (1) COMAR 10.17.01.21, (2) the whole of COMAR 10.17.01.03B—which does not allow for maintenance and repair to a previously approved pool's original condition if such maintenance or repair creates or continues to permit a danger to the health and safety of pool users—and (3) COMAR 10.17.01.03D, which clearly provides that a previously approved pool is not exempted from complying with any regulation contained within the chapter if the pool "has a condition that jeopardizes the health or safety of the public[.]" Were we to conclude otherwise and affirm the circuit court's ruling, we agree with appellant that we would strain interpretation of the Chapter and COMAR 10.17.01.03 to an absurd result and generally create bad public policy. Were we to conclude, as the circuit court did, that previously approved pools could be maintained as originally approved, unless compliance with a regulation is required by COMAR 10.17.01.03E, without regard to the health and safety of the individuals using the pool, we would, of necessity, have to conclude, for example, that owners need not comply with COMAR 10.17.01.50—which provides that an owner may not knowingly permit a person to enter a pool, *inter alia,* who has an infectious or contagious disease that may be transmitted through water—or with COMAR 10.17.01.25—which provides for the installation and maintenance of circulation systems meeting certain criteria. We refuse to interpret the COMAR regulations in this manner.

Our reading of COMAR 10.17.01.03 and our conclusion that previously approved pools are not exempted from compliance with COMAR 10.17.01.21 is bolstered by the legislative history of the regulations as well as the purpose and scope of the Chapter. The Model Barrier Code for Residential Swimming Pools, Spas and Hot Tubs, adopted and incorporated by reference into the COMAR chapter governing swimming pools, *see* COMAR 10.17.01.04D, demonstrates the great concern that pools be surrounded by an adequate barrier so as to prevent young children from accidental drownings and near drownings. In the purpose statement of the Model Barrier Code, the objective of the Code is listed as establishing requirements to deter access by children to pools, especially children under five years of age, who are not able to appreciate the dangers posed by pools. As part of maintaining an adequate pool barrier, the Model Barrier Code requires that a sphere greater than four inches not be permitted to pass through openings in the barrier. In the Notice of Proposed Action proposing adoption of the new COMAR regulations, the Notice specifically states: "The purpose of this action is to enact regulations that protect and promote the health and safety of individuals at public and semipublic swimming pools and spas[.]" Proposed Action on Regulations, 22:14 Md. Reg. 1067 (July 7, 1995). The new regulations included a proposed regulation adopting the four inch sphere requirement set forth in the Model Barrier Code. *Id.* at 1074.

In the Notice of Proposed Action, the economic impact of the new regulations was discussed in some detail. *Id.* at 1067–68. Although the Notice stated that the economic impact on existing public pools "should be minimal due to the grandfathering" of those preexisting pools, the Notice specifically recognized that some owners will face "increased cost[s]" to "meet updated standards," and that, as a result of the new regulations, "[t]he public should have greater protection of health and safety, resulting in reduced illness and injury." *Id.* at 1067. The Assumptions contained within the Notice stated that "[a]ny potential economic impact may be spread out through the use of a compliance schedule[,]" i.e. an owner of a

preexisting pool could take some time to comply with the new regulations and spread out the costs associated with compliance over time. *Id.* at 1068. The main Assumption, however, was that "[t]he public [would] have significant, nonquantifiable savings as a result of decreased illness and injury at public pools and spas." *Id.*

As adopted, the COMAR regulations demonstrate an intent to provide measures to increase public health and safety at public swimming pools in Maryland. Indeed, COMAR 10.17.01.01 explicitly recognizes this intent and states that the purpose and scope of the chapter is to "enact regulations that protect and promote the public health and safety of individuals at public spas and pools" and to establish "minimum criteria for public pools and spas." In light of this explicit purpose and scope, and given the legislative history demonstrating an intent to protect children at pools, in part through the adoption of the four inch sphere requirement as set forth in the Model Barrier Code, we have no difficulty in concluding that the Country Place pool was required to comply with the 1997 COMAR regulations, including COMAR 10.17.01.21.

As a separate matter, we note that the circuit court failed entirely to consider the applicability of Montgomery County statutory and regulatory provisions concerning pool barriers. Based on our review of the statutes and regulations at issue, we conclude that the 1990s Mont. Co.Code and COMCOR provisions were applicable to the Country Place pool at the time of the incident.[27] As with the COMAR regulations, we begin by determining that, under Mont. Co.Code § 51–1(j) and COMCOR 51.00.01.01, the Country Place pool is a public swimming pool, "intended to be used collectively by numbers

---

27. We observe that our analysis would be the same were we to have determined that the 1970s Montgomery County statutes and regulations applied as the operative language governing pool barriers at public swimming pools is the same as that contained within the 1990s statutes and regulations—namely, that outdoor swimming pools be enclosed with a barrier "designed so as to minimize the possibility of unauthorized or unwary persons entering the pool area." *See, e.g.,* Laws of Montgomery County, 1971, Executive Regulation No. 3–71 Section III(B).

of persons for swimming, diving, wading, or recreational bathing." Mont. Co.Code § 51–3(a), concerning the scope of the chapter, provides that "[a]ll physical standards required by this chapter shall apply to all public swimming pools constructed after the effective date of this chapter." The Editor's Note to § 51–3 states that the effective date of the chapter is March 10, 1971—well before the pool was constructed in 1978 and before the near drowning in 2010.

As to pool barriers specifically, Mont. Co.Code § 51–15(b)(2) provides that public swimming pools must be permanently enclosed "as required by the manual of public swimming pool construction." The Editor's Note to § 51–15 provides that § 51–15(b)(1), concerning permanent enclosures of private swimming pools, and § 51–16, concerning pool fences, gates, and locks of private swimming pools, "apply only to a pool for which the building permit is submitted after the effective date of this law (July 13, 1990)." As the Country Place pool is not by any stretch of the imagination a private swimming pool, the later effective date of those provisions governing private swimming pools is of no consequence to the applicability of Mont. Co.Code § 51–15(b)(2). Indeed, that appellees contend otherwise on brief—namely, that the 1997 version of the Mont. Co.Code "specifically states that the requirements of Montgomery County Code § [ ] 51–15, 'Enclosure of swimming pools' and Code § [ ]51–16, 'Swimming Pool fences, gates and locks,' are not applicable to pools built prior to July 13, 1990"—is simply absurd and contrary to the plain language and construction of the statute.

As Mont. Co.Code § 51–15(b)(2) applies to the Country Place pool, appellees were required, in turn, to comply with COMCOR 51.00.01.03(B), which states, in relevant part, that "[a]ll outdoor swimming pool areas must be enclosed by an ornamental wire, wood stave or other type of barrier designed so as to minimize the possibility of unauthorized or unwary persons entering the pool area."

Thus, in summary, we conclude that the 1997 COMAR regulations governing public swimming pools, and specifically

COMAR 10.17.01.21 governing pool barriers, as well as the 1997 Montgomery County statutory and regulatory provisions, were applicable to the Country Place pool at the time of the incident in this case—*i.e.* appellees were required, by statute and regulation, to comply with the regulations and code provisions relevant to public swimming pools, in general, and pool barriers, in particular.  That the circuit court found otherwise was error.

### (b) Violation of a Statute as the Standard of Care

■  Next, despite that appellees were required to comply with the 1997 statutes and regulations, as discussed in detail above, we must determine whether those statutes and regulations may properly be invoked to establish a standard of care, and whether violations of the same statutes and regulations may serve as evidence of negligence.  We adopt the standard of care set forth in the statutes and regulations, determining that the statutes and regulations create a civil tort action, and that the violation of the statutes and regulations is evidence of negligence.  We explain.

As to whether the statutes and regulations at issue are proper for this Court to adopt as the applicable standard of conduct, we are guided by *Joseph* and the Restatement, Second of Torts.  We observe that the statutes and regulations applicable here do not, in themselves, contain express provisions that violation shall result in tort liability, thus, we must determine whether to adopt the requirements of the statutes and regulations "as the standard of conduct necessary to avoid liability for negligence."  Restatement, Second of Torts § 285 cmt. c. We turn to Restatement, Second of Torts §§ 286 and 288.  Here, we have no difficulty in concluding that the statutes and regulations—Mont.  Co.Code § 51–15(b)(2), COMCOR 51.00.01.03(B), and COMAR 10.17.01.21—meet the requirements as set forth in §§ 286 and 288 for adoption by this Court as standards of care.  The purpose of the Montgomery County statutes and regulations governing public swimming pools and the Maryland regulations governing public swimming pools meets the four part test set forth in

§ 286, in that the statutes and regulations are meant to protect: (1) a class of persons including the one whose interest was invaded—namely, the general public, those who use swimming pools, and Christopher, the individual injured in this case; (2) the particular interest invaded—*i.e.* the health and safety of individuals at public swimming pools; (3) the interest against the kind of harm which resulted—i.e. protecting the health and safety of individuals at public swimming pools from drownings and near drownings; and (4) the interest against the particular hazard from which the harm results—namely, the public's health and safety are to be protected by adequate pool barriers that prevent individuals from accessing pools and drowning or near drowning.[28]

The purpose of the statutes and regulations is to protect the public's health and safety at public swimming pools. Mont. Co.Code § 51–8(a)(3) provides that the following basic principle, among others, "shall govern the operation of public swimming pools and shall be used to interpret, promulgate regulations and to serve as the basis of issuance and renewal of operating permits[:] ... To eliminate hazards to the health and safety of bathers and occupations due to: a. Unsafe conditions, and b. Unsafe practices." Mont. Co.Code § 51–3(a), concerning the scope of the chapter, provides, in relevant part, as follows:

All physical standards required by this chapter shall apply to all public swimming pools constructed after the effective date of this chapter. The physical standards shall apply to all public swimming pools in existence prior to the effective date and to all private swimming pools proposed for conversion to a public swimming pool where:

. . .

(2) Any physical condition exists which would endanger the health, safety or life of any person within the pool or immediately adjacent thereto.

---

**28.** The requirements of Section 288 are similarly satisfied as the purpose of the statutes and regulations do not fulfill exclusively any of the seven items detailed in Section 288(a)-(g).

The Montgomery County pool barrier regulation includes explicit language that the barrier must be designed "so as to minimize the possibility of unauthorized or unwary persons entering the pool area." COMCOR 51.00.01.03B. Similarly, as discussed above, the COMAR regulations, and the legislative history leading up to their adoption, demonstrate an intent to provide measures to increase the public health and safety at public swimming pools in Maryland. Indeed, COMAR 10.17.01.01 explicitly recognizes this intent and states that the purpose and scope of the Chapter is to "enact regulations that protect and promote the public health and safety of individuals at public spas and pools" and to establish "minimum criteria for public pools and spas." The four inch sphere requirement adopted in COMAR 10.17.01.21, based on the Model Barrier Code, was created specifically to ensure that children are deterred and prevented from gaining access to swimming pools where they could drown or near drown. COMAR 10.17.01.03 exempts previously approved pools from compliance with certain regulations except in cases where the public's health or safety is jeopardized by a condition or danger that exists at the pool. Thus, unlike in *Joseph*, 173 Md.App. at 331–34, 918 A.2d 1230, where the county statute at issue was contained within a chapter generally governing landlord-tenant relations, and where with the express purpose of the statute was to improve relations between landlords and tenants, here, we are satisfied that the purpose of the statutes and regulations is, in large part, to protect the health and safety of the public. We, therefore, conclude that the statutes and regulations were designed to create a cause of action in tort for the protection of the swimming public.

We move to the next step—whether violation of the statutes and regulations may serve as evidence of negligence in light of the contention that Christopher was a trespasser. *See Joseph*, 173 Md.App. at 321–22, 918 A.2d 1230. In this case, there is no doubt that the criteria identified in *Joseph* were fulfilled, and that violation of the 1997 statutes and regulations may properly serve as evidence of appellees' negligence. First, appellees allegedly violated the applicable stat-

utes and regulations by maintaining a pool barrier which: (1) allowed passage of a sphere greater than 4 inches in diameter when the gate was closed and (2) failed to minimize the possibility of unauthorized or unwary persons entering the pool area. COMAR 10.17.01.21A(3); Mont. Co.Code § 51–15(b)(2); COMCOR 51.00.01.03(B). Second, the injury that resulted, Christopher's near drowning, was a type of injury which the statutes and regulations were specifically designed to prevent—adequate pool barriers prevent children from accessing a pool and near drowning. Finally, Christopher was a member of the class that the statutes and regulations were designed to protect—he was a small child, a member of the general public who used a public swimming pool, and an "unauthorized or unwary person" entering the pool area. We know of no case law or other authority supporting the proposition that the violation of a statute as evidence of negligence is dependent upon the existence of a common law duty. For these reasons, we conclude that contrary to appellees' contention—that the principle of violation of a statute as evidence of negligence applies only where a defendant owes a common law duty to the plaintiff—the alleged violation of the applicable 1997 statutes and regulations may constitute evidence of negligence.[29]

We pause briefly to address Christopher's status as a tenant and the contractual duties owed to him by appellees pursuant to the lease and its addenda. Pursuant to appellant's lease, Blackburn agreed to "substantially comply with applicable federal, state, and local laws regarding safety, sanitation, and

---

**29.** As to appellees' notice, in *Rivers*, 182 Md.App. at 654, 959 A.2d 110, we stated that a plaintiff "need not show that the defendant had knowledge of the statutory violation (although the statute itself might require knowledge in order to establish a violation)." (Citation omitted). Here, the statutes and regulations that we adopt as the applicable standard of conduct do not require that appellees have notice of their violation. Accordingly, appellant was not required to allege that appellees had knowledge of the statutory and regulatory violations, although, we observe as an aside, appellant alleged before the circuit court that appellees were aware that children had gained access to the pool when it was closed on at least one prior occasion.

fair housing[,]" and to "make all reasonable repairs, subject to [the tenant's] obligation to pay for damages for which [the tenant] is liable." In the Montgomery County, Maryland–Addendum to the lease, Blackburn agreed to "deliver the leased premises and all common areas in a clean, safe, habitable and sanitary condition, free of rodents and vermin, and in complete compliance with all applicable laws." In the addendum, Blackburn further acknowledged its "responsibility for maintaining the premises in accordance with all applicable laws." In essence, as to the Country Place pool, a common area under appellees' control used by all tenants, *see Hemmings v. Pelham Wood LLP*, 375 Md. 522, 538, 826 A.2d 443 (2003), Blackburn contracted to meet its statutory and regulatory duties. Accordingly, the contractual duties, in this case, are part and parcel of the statutory and regulatory duties owed, and need not be addressed separately.

### (c) Causation

■ As a final matter, we determine that the circuit court erred in finding that, because there was no direct proof of proximate causation, *i.e.* there was no direct evidence "demonstrating exactly how Christopher circumvented the fence," appellant failed to make out a *prima facie* case of negligence. We agree with appellant that proximate cause need not be proven with direct evidence, but rather may be shown through circumstantial evidence. For example, in *Dow v. L & R Props., Inc.*, 144 Md.App. 67, 75, 796 A.2d 139 (2002), this Court discussed proximate cause in a negligence action generally, stating:

> There is no requirement that, in a negligence suit, "the matter of causation ... be proved by direct and positive proof to an absolute certainty." Circumstantial evidence may support a negligence determination if it "amounts to a reasonable likelihood or probability rather than a possibility." Indeed, " 'Maryland has gone almost as far as any jurisdiction that we know of in holding that meager evidence of negligence is sufficient to carry the case to the jury'...."

Of course, "causation evidence that is wholly speculative is not sufficient."

(Citations omitted) (omissions in original). *See also Lyon v. Campbell,* 120 Md.App. 412, 437, 707 A.2d 850, *cert. denied,* 350 Md. 487, 713 A.2d 980 (1998) ("We are mindful that 'the matter of causation [does not have] to be proved by direct and positive proof to an absolute certainty.' Circumstantial evidence that supports a 'rational inference' of causation is legally sufficient." (Citations omitted) (alteration in original)).

That there was no direct evidence demonstrating how Christopher gained access to the pool area—for example, in the form of an eyewitness, a surveillance videotape, or Christopher's own recollection—was not dispositive of the determination of proximate cause. The following circumstantial evidence was sufficient to survive summary judgment on the issue of causation and leads to the reasonable inference that Christopher gained access to the pool area by squeezing through the gap in the gate: (1) at the time of the near drowning, Christopher was three-years-old, and his head was approximately 5.1 inches wide; (2) appellant discovered Christopher submerged in the water in the five foot section of the pool closest to the gate; (3) when investigating the near drowning, Detective Hamill observed a pair of shoes and a T-shirt on the "first table [ ] inside the front gate"; (4) Detective Hamill observed that there was "a lot of play in the gate," and that she was "able to completely put [her] leg from the waist down into that [ ] opening, [with] how the gate bowed out"; (5) Detective Hamill stated that it did not take the "force of an adult" to open the gate; (6) Beerman, Berkshire's property manager, testified that he inspected the pool barrier within a day of the near drowning and measured six inch spacing between the vertical posts of the fence; (7) neither Detective Hamill nor Officer Magnelli observed any cuts, bruises, or other injuries to Christopher—*i.e.* marks indicating that he climbed or jumped over the six foot fence surrounding the pool; and (8) Officer Magnelli testified that there was no evidence suggesting that Andre assisted Christopher in gaining access to the pool area. Based on this chain of circum-

stantial evidence, we have no difficulty in concluding that the circuit court erred in finding there was not a "scintilla of evidence demonstrating exactly how Christopher circumvented the fence," and in granting summary judgment on the issue of causation.

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.**